LISA GOLLIN EVANS (MA SB # 200730)          THE HONORABLE WILLIAM H. ALSUP
(Admitted *Pro Hac Vice*)
Earthjustice
21 Ocean Avenue
Marblehead, MA  01945
(781) 631-4119
levans@earthjustice.org

JAN HASSELMAN (WSB #29107)
(Admitted *Pro Hac Vice*)
Earthjustice
705 Second Avenue, Suite 203
Seattle, WA  98104
(206) 343-7340
(206) 343-1526 *[FAX]*
jhasselman@earthjustice.org

*Attorneys for Plaintiffs Sierra Club, Great
Basin Resource Watch, Amigos Bravos, and
Idaho Conservation League*

GREGORY C. LOARIE (CSB #215859)
Earthjustice
426 - 17th Street, 5th Floor
Oakland, CA  94612
(510) 550-6725
(510) 550-6749 *[FAX]*
gloarie@earthjustice.org

*Local Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | | |
|---|---|---|
| SIERRA CLUB, et al., | ) | Case No.  3:08-cv-01409-WHA |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | DECLARATION OF MARIANA |
| | ) | CHEW-SANCHEZ |
| STEPHEN JOHNSON, et al., | ) | |
| | ) | |
| Defendants, | ) | |
| and | ) | |
| | ) | |
| SUPERFUND SETTLEMENTS PROJECT, et al., | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |

DECLARATION OF MARIANA CHEW-SANCHEZ
(Case No. 3:08-cv-01409-WHA)

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

I, MARIANA CHEW-SANCHEZ, declare and state as follows:

1.      I am an Environmental Sciences and Engineering Ph.D. Candidate at the University of Texas at El Paso.  I am over the age of 21 and competent to testify to all matters contained herein.  I reside with my two daughters, Ximena Alejandra (13) and Thelma Priscila (12) at 420 Clayton Road. El Paso, Texas and lived in El Paso for the past thirteen (13) years.

2.      I am a member in good standing of the Sierra Club, and have been for the past three years, and have volunteered for Sierra Club's causes for more than nine years.  I am also a Sierra Club employee within the Environmental Justice Program since January 2005.

3.      I am a member of a family who has lived in the El Paso del Norte region for over a hundred years.  El Paso del Norte region includes two nations –United States and Mexico: Dona Ana County, New Mexico, El Paso County, Texas and the Municipality of Ciudad Juarez, Chihuahua, Mexico.  The American Smelting and Refining Company ("ASARCO") is located in the United States and approximately 300 feet from the United States border with Mexico and approximately 500 feet from Monument 1, which is where the two nations and three states come together.  Because of its location and the prevailing winds, ASARCO contaminates Mexico and New Mexico more heavily than Texas.  Therefore, ASARCO's operation is a bi-national and interstate issue.

4.      My family has been very active in environmental and social justice and economic development.  We currently have and have had many judges, doctors, teachers, lawyers, public administrators, and businessmen in our family on both sides of the U.S./Mexico border.  Many of them, including myself, live or lived within a few miles from ASARCO.  We have experienced the lethal consequences and serious damage to our health caused by ASARCO.

5.      ASARCO operated a copper smelter in El Paso from 1887-1999.  It had closed operation due to falling world copper prices and its inability to compete.  Between 1992 and 1997, ASARCO illegally burned hazardous waste in their El Paso smelter.  ASARCO and its Corpus Christi subsidiary, Encycle, had a permit to extract metals from hazardous waste, but instead simply sent the waste to El Paso to be burned in an attempt to save money.  As a result,

DECLARATION OF MARIANA CHEW-SANCHEZ
(Case No. 3:08-cv-01409-WHA)   -1-

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

more than 5,000 tons of hazardous waste were illegally burned in our city, including more than

300 tons of chemical warfare agents from the Rocky Mountain Arsenal outside Denver,

Colorado.  For this, ASARCO was fined $20 million by the EPA in 1999.

(http://www.shapleigh.org/news/2007-from-the-senator-s-desk, last checked August 27, 2008

(hereinafter "Shapleigh 2008") and Letter from Department of Justice regarding EPA's Response

to the Encycle/ASARCO Settlement Statement, July 31, 1998, attached as Exhibit 1.).  Since

ASARCO's closure, the air in El Paso has greatly improved and the City of El Paso was able to

reclassify from a non-attainment to an attainment city.  This reclassification lifts the sanctions,

stigma, and health risks associated with non-attainment.

      6.     In 2002, after the copper prices rose sufficiently, ASARCO submitted a permit

renewal to the Texas Commission on Environmental Quality ("TCEQ").  The permit renewal

process addresses air and water criteria.  Despite its poor record of meeting environmental

standards and illegal activities, ASARCO was granted the renewal of the permit by the TCEQ on

February 8, 2008.  The TCEQ disregarded the concerns of the neighboring states and Mexico

because it was not in its jurisdiction or purview.  It did not refer or consider input from the

federal Environmental Protection Agency ("EPA").  The TCEQ willfully and knowingly granted

the renewal of the air permit without taking into account the most contaminated areas were New

Mexico and Mexico and their opposition at federal, state and local levels.  Elected officials, from

El Paso, Ciudad Juarez, and the states of New Mexico, Chihuahua, Texas and the Mexican

Congress communicated their opposition to the TCEQ.  The communiqués included a resolution

from the Mexican Congress, letters from New Mexico's and Chihuahua's governors to the

governor of Texas; resolutions, petitions and testimony from state and federal legislators,

mayors, environmental experts and from members of the affected communities on both sides of

the U.S./Mexico border.  To add insult to injury, the TCEQ acknowledged that it did not have the

resources to properly oversee ASARCO and that it would continue the long-standing practice of

self-monitoring by ASARCO and that ASARCO would only have to make marginal

improvements to its facility.  This smelter is over one hundred years old and its plant has been

DECLARATION OF MARIANA CHEW-SANCHEZ
(Case No. 3:08-cv-01409-WHA)   -2-

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

1  'grandfathered' or granted variances not afforded to smelters operating in the U.S. today.

2       7.      ASARCO's copper smelting process produces many by-products, some of which

3  are released into the air or dumped as slag.  According to previous litigation records (City of El

4  Paso and other lawsuits against ASARCO) and from the testimony provided at the TCEQ air

5  permit renewal hearings, it is well established that ASARCO's smelters and its facility in El Paso

6  contribute or have contributed a major source of contamination to the air, soil, and water.

7       8.      ASARCO's copper smelter produces more than 100 toxic (to humans) by-

8  products.  Among the most lethal, commonly known and most documented are lead and arsenic.

9  During the hearings, TCEQ experts stated that it does not have the capacity to monitor some of

10  the contaminants produced by ASARCO that are known to be toxic to humans.  These

11  contaminants are directly linked to a broad range of health issues.  They affect the human

12  nervous and reproductive systems and cause cancer.  High doses of many of these substances,

13  such as lead and arsenic, are deadly.  Poisoning symptoms go undetected for years or are latent.

14  Among the reasons are the lack of medical facilities and equipment, poverty, lack of education

15  and information and because, at low levels, the effects are subtle, cumulative and affect persons

16  differently.  As with many toxic substances, exposure to these substances is particularly harmful

17  to infants and children.  It affects their physical and mental development when the substances are

18  absorbed.

19       9.      In 2001, an *El Paso Times* newspaper article stated that high levels of cadmium,

20  arsenic and lead had been found in soil samples taken near the Sun Bowl stadium in El Paso.

21  The Sun Bowl is located across Interstate 10 from ASARCO.  Texas State Senator Eliot

22  Shapleigh requested advice from local health and environmental experts.  Subsequently, the EPA

23  began sampling soils in residential areas and identified properties that exceeded the safe levels

24  for lead and arsenic.  Results of EPA sampling indicated that lead and arsenic levels in the soil

25  were elevated with levels as high as 1,700 parts per million of lead and 81 parts per million of

26  arsenic and attributable to ASARCO.

27       10.     Lead and arsenic are listed as hazardous substances as defined by the

28

DECLARATION OF MARIANA CHEW-SANCHEZ
(Case No. 3:08-cv-01409-WHA)   -3-

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") § 101(14) and listed at 40 C.F.R. § 302.4.

A.    Lead poisoning can affect nearly every system in the body.  Because lead poisoning often occurs with no immediate and obvious symptoms, it frequently goes unrecognized.  Lead poisoning can cause learning disabilities, behavioral problems, and, at very high levels, seizures, coma, and death.  Several studies have shown that arsenic affects organ tissues and can increase the risk of lung cancer, skin cancer, bladder cancer, liver cancer, kidney cancer, and prostate cancer.

B.    There have not been any recent systematic studies of children in El Paso to look at the contribution of soil lead levels to blood lead levels.  However, health studies indicate that lead in soil and dust can be a significant exposure pathway.

C.    Children are more sensitive to the effects of lead than adults.  Lead can affect children in different ways depending on how much lead the child swallows.  Ingesting large amounts of lead can cause severe health effects such as anemia, kidney damage, colic, muscle weakness, and brain damage.  Ingesting small amounts of lead may result in effects such as learning and behavior problems, slow development, and IQ loss in children, as well as other developmental effects one may not see.

11.    EPA, in cooperation with the TCEQ, the New Mexico Environment Department, the City of El Paso, the City of Sunland Park, the Agency for Toxic Substances and Disease Registry, and the Texas Department of State Health Services began to address the clean-up of contaminated soils in El Paso, Texas.  The EPA did not address the contamination in New Mexico or Mexico.  As of 2008, the EPA tested 3,683 properties and had cleaned up over 970 properties in El Paso.  This action was taken to protect the public health and the environment.  It is important to mention that the properties cleaned up were located in one of the most politically, economically, and socially powerful areas of the City of El Paso.  Some of the most contaminated areas were left out of the testing and clean up, such as Anapra, New Mexico, Anapra, Mexico and the communities in El Paso adjacent to ASARCO.

DECLARATION OF MARIANA CHEW-SANCHEZ
(Case No. 3:08-cv-01409-WHA)    -4-

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

12.    As of 2004, the EPA had either committed or expended its "emergency clean up funds" to remediate properties.  In El Paso, many additional properties were identified as needing remediation and many more remained to be tested.  Additional EPA funds for remediation will be contingent on the designation of El Paso as a "Superfund site" and its placement on the National Priority List (NPL).  Being listed as a Superfund site has been a point of controversy at the local level.  Labeling El Paso one of the most contaminated sites in the nation has economic and community development repercussions due to the negative connotations.

13.    The number of properties in El Paso requiring remediation under the EPA's program is unknown.  This is because the testing and evaluation of all properties located in the areas affected by ASARCO is incomplete and unknown.  In addition, the EPA decided not to conduct tests or to comprehensively evaluate the claims of contamination in New Mexico and Mexico by the state and country, respectively.

14.    In 2007, ASARCO contracted services and resumed its clean-up of properties in El Paso with the EPA's oversight.  One hundred forty-nine (149) properties were remediated.  This phase of the remediation was completed by December 2007.  However, ASARCO burned hazardous waste illegally after it had cleaned up areas, and there were no attempts made to re-evaluate those sites.  Further clean-up of the remediated sites affected by ASARCO's burning of hazardous chemical waste was not and is not considered.

15.    According to EPA, out of approximately 7,000 properties in the area of El Paso, about 2,100 have been tested in a very limited radius of 3 miles, and that only includes the Texas portion of that area (Shapleigh, 2008).  Because of the limited testing, EPA cannot project if this site will be proposed to Superfund's National Priorities List.  The EPA states that this "process has been temporarily placed on hold" but that "[it] is important that clean-up work continue in the meantime to protect public health."  (http://www.epa.gov/region6/6sf/el_paso_index.htm, last checked August 22, 2008).

16.    The smelter in El Paso is not ASARCO's only Superfund site.  ASARCO is named as either the sole responsible party or one of a group of parties responsible for dozens of

DECLARATION OF MARIANA CHEW-SANCHEZ
(Case No. 3:08-cv-01409-WHA)   -5-

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

federal Superfund sites around the nation.  In 2003, ASARCO and EPA agreed to set up a trust fund of $100 million to help pay the company's environmental clean-up costs.  But ASARCO's liabilities far exceeded that amount.  ASARCO's portion of the clean-up costs for its Superfund sites, which total nearly $3 billion, is estimated to be between $500 million and $1 billion.

17.    In 2005, ASARCO declared Chapter 11 bankruptcy.  My concern and one that is shared with the El Paso del Norte community is that the bankruptcy does not contemplate the investigation and clean-up that is still needed to address the illegal burning of hazardous waste and the areas of New Mexico and Mexico that were not addressed in the original remediation. The testing and areas affected by the bankruptcy agreement focus on the least affected areas and the least affected neighborhoods in El Paso, Texas.

18.    I am concerned that ASARCO will not have sufficient resources to investigate, mitigate, and clean up, in a complete and timely fashion, all of the properties contaminated with hazardous substances from its El Paso smelter.  Currently, the focus of the investigation, mitigation and clean-up does not include other parts of the City of El Paso and New Mexico and Mexico.  During the administrative permit hearings held in El Paso by TCEQ in July 2005, ASARCO representatives, under oath and before the administrative law judges, accepted that the most contaminated areas were New Mexico and Mexico.  And then, to thwart any potential damage, ASARCO began a massive media campaign.  It advertised high paying jobs, concern for the environment and the economic benefit it brought to the City and the area.

19.    My other concern is that with the exhaustion of the Superfund and the federal unwillingness to increase funding, will there ever be sufficient federal funds for clean-up of contaminated properties?  Will the parties, ASARCO and the EPA, weather out the storm and keep using the excuse that they do not have the funding and are unable to do so?  Must the communities bear the brunt of the charges to clean the area or do they just learn to live with it (time is on ASARCO's side)? ASARCO might reorganize again, file bankruptcy again and the EPA may simply declare this matter just another local issue, again.  ASARCO is banking on attrition and that its opponents will retreat due to lack of interest and money.  Recently, fear is

DECLARATION OF MARIANA CHEW-SANCHEZ
(Case No. 3:08-cv-01409-WHA)    -6-

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

1  being used to override environmental legislation.  Copper will become a vital, strategic,

2  economic or national interest in the face of a global economy and deficit trade.

3      20.    The failure to clean up properties in my community not only endangers the people

4  who live on the site and know about the problem, but families who do not know about the

5  problem and all those that purchase the affected properties (including known and unknown

6  contaminated properties).  Disclosure is both good and bad.  The people who own a

7  contaminated property know they are living in a dangerous situation.  Many may have to wait for

8  years to get the problem resolved.  Some move out and try to down play the gravity of the

9  situation. Many of the property owners in previously affected areas will move out before

10 ASARCO starts its operations and cut their losses.  Those that live there and do not know if their

11 property is contaminated may not want to know because the value will go down.

12     21.    I understand that areas outside the 3-mile area being evaluated by the EPA are

13 contaminated. I also know that there is no plan or effort by the TCEQ or the EPA to evaluate the

14 extent of the contamination.

15     22.    If the U.S. Environmental Protection Agency required companies that generate

16 hazardous substances, like ASARCO and other smelters, to provide financial assurance to clean

17 up the pollution caused by their activities, there would be funds available to complete the clean-

18 up in El Paso, New Mexico, and Mexico and thereby protect these communities, and my own

19 family, from poisoning by hazardous substances.

20     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

21 and correct to the best of my knowledge. Executed this 28th day of August, 2008, in El Paso,

22 Texas.

25 MARIANA CHEW-SANCHEZ

DECLARATION OF MARIANA CHEW-SANCHEZ
(Case No. 3:08-cv-01409-WHA)  -7-

Earthjustice
705 Second Ave., Suite 203
Seattle, WA 98104
(206) 343-7340

# EXHIBIT 1

Kathleen Hartnett White, *Chairman*
R. B. "Ralph" Marquez, *Commissioner*
Larry R. Soward, *Commissioner*
Glenn Shankle, *Executive Director*



## TEXAS COMMISSION ON ENVIRONMENTAL QUALITY

*Protecting Texas by Reducing and Preventing Pollution*

July 21, 2006

<u>VIA OVERNIGHT DELIVERY</u>

Ms. Heather McMurray

Re:    Public Information Act Request Regarding EPA's Analysis of ENCYCLE
       material leading to DOJ's Asarco multimedia consent decree
       PIA No. 06.07.05.01

Dear Ms. McMurray,

In response to your e-mail request received by the Agency on July 5, 2006, enclosed
please find a copy of the document referenced above, which may also be referred to as
"EPA Response to Encycle/Asarco Settlement Statement."

If we can be of any further assistance, please do not hesitate to contact me at (512) 239-
4113.

Sincerely,

Booker Harrison
Senior Attorney
Environmental Law Division

**U.S. Department of Justice**

Environment and Natural Resources Division

90-7-1-886

Michael D. Goodstein
*Environmental Enforcement Section*
*P.O. Box 7611*
*Washington, DC 20044-7611*

*Telephone (202) 514-1111*
*Facsimile (202) 616-6583*

July 31, 1998

<u>By Hand</u>

Peter J. Nickles
John T. Smith
Covington & Burling
1201 Pennsylvania Avenue, N.W.
P.O. Box 7566
Washington, D.C. 20044-7566

Dear Peter and J.T.:

        Enclosed is the EPA's Response To the Encycle/ASARCO
Settlement Statement.  We look forward to meeting again on these
issues after Encycle and ASARCO have an opportunity to review it.

                                        Sincerely,

                                        Michael D. Goodstein

Enclosure

JUL-18-2006 15:41 FROM:                    9158344940              TO:5122390606          P.3/24

CONFIDENTIAL: For Settlement Purposes Only          July 31, 1998

### EPA RESPONSE TO ENCYCLE/ASARCO SETTLEMENT STATEMENT

I.    Summary

        The basic position put forth in the Encycle/ASARCO
settlement statement of June 9, 1998 ("the settlement statement")
is that no penalties are appropriate for any activities that
Encycle and ASARCO perceive to be covered by the Texas Water
Commission ("TWC") letter of September 27, 1989 ("TWC _etter").
Encycle and ASARCO contend that the letter from the TWC
referencing the exemption in 40 C.F.R. § 261.2(e)(1)(ii) for
use/reuse as an effective substitute for a commercial product
("the use/reuse exemption") covers the unpermitted management of
hazardous waste, i.e., Encycle alleged metals concentrate
products (Encycle alleged "products") at the Corpus Christi
facility, and further covers the unmanifested shipment of Encycle
alleged "products" to ASARCO's East Helena and El Paso smelters,
and to other customers both domestic and international.
Additionally, Encycle and ASARCO contend that the TWC letter also
covers the failure of ASARCO to properly manage Encycle alleged
"products" as hazardous waste at its two receiving smelters.

        Even under Encycle and ASARCO's stated interpretation,
however, the TWC letter cannot be construed to cover sham
recycling.  Therefore, the evidence of sham recycling is an
appropriate starting point in this response to the settlement
statement. As previously discussed and outlined below, Encycle's
own business records provide compelling evidence of sham
recycling.  Numerous hazardous wastes with little or no
recoverable metals value, were mixed into Encycle alleged
"products".  This activity constituted unpermitted treatment and
storage of RCRA hazardous waste at Encycle.  This practice led to
further unpermitted storage, and disposal of RCRA hazardous waste
at the smelters.  The wholesale commingling of the sham hazardous
wastes into Encycle alleged "products" rendered the alleged
"products" and Encycle's alleged exempt recycling processes
ineligible for any recycling exemption.  For this reason alone,
the analysis provided in the settlement statement is fatally
flawed, and should be expeditiously reconsidered by Encycle and
ASARCO.

        In addition to the sham recycling evidence, a review of
applicable law and the details of Encycle's operations compels
the conclusion that even if it had been accepting only legitimate
recyclables, the Encycle alleged "products" still could never
have qualified for the use/reuse exemption referenced in the TWC
letter.  The use/reuse exemption is not available for wastes that

are being reclaimed. Because the alleged "products" were being reclaimed at smelters and other metals recovery facilities, Encycle and ASARCO should have concluded that none of the use/reuse exemptions were applicable to Encycle alleged "products". Importantly, in addition to the language of the regulation, pertinent explanations of the regulations by EPA were not only publicly available to Encycle and ASARCO during the relevant time period, but were provided to them by the TWC as early as 1988. Encycle and ASARCO had actual notice of EPA's relevant regulatory interpretations prior to receiving the TWC letter upon which Encycle and ASARCO so heavily rely.

Additionally, based on the information now available to the governments, including the information in the settlement statement, it remains clear that the submittals made by Encycle to the TWC about its operations, upon which the 1989 TWC letter was based, did not accurately describe the processes employed by Encycle. As previously articulated, and outlined below, the Encycle submittal upon which the 1989 TWC letter was based, completely omitted a description of the substantial direct mixing of unprocessed hazardous waste into its alleged "product". Nothing in the settlement statement effectively disputes these facts. As such, the TWC letter was inappropriately relied on by Encycle and ASARCO, because the application of the exemption to Encycle alleged "products" was legally erroneous, and also because the operations documented to the TWC were different than Encycle's actual operations.

## II. Encycle and ASARCO Engaged In Extensive Sham Recycling

When EPA promulgated the new definition of solid waste in 1985, the Agency discussed the importance of determining whether a claimed recycling activity was legitimate or sham. To aid the regulated community and regulators in making such a determination, EPA articulated the "sham recycling criteria" - a list of factors that could be evaluated to determine whether an activity was recycling or surrogate disposal. 50 Fed. Reg. 614, 638-639, 646 n.36 (1985). The Agency has expounded on the criteria on other occasions as well. See e.g. 52 Fed. Reg. 16982, 17013 (May 6, 1987) and 53 Fed. Reg. 519, 522 (January 8, 1988). Encycle's historic operations fair poorly under most of the sham recycling criteria. The evidence pertaining to one of the factors is so compelling, however, it is not necessary to discuss the remainder of the factors. EPA has made clear that sham recycling, as opposed to legitimate recycling, occurs when the hazardous waste purportedly recycled contributes in no significant way to the production of the product allegedly resulting from the recycling. The 5th Circuit U.S. Court of

-2-

Appeals affirmed this position in <u>United States v. Marine Shale Processors</u>, 81 F.3d 1371 (5th Cir. 1996). There the Court held that EPA had properly refused to grant a Boiler and Industrial Furnace permit to Marine Shale after determining that the company was engaged in sham recycling. EPA's decision in <u>Marine Shale</u> was based in large part on the fact that the facility was burning "zero value" wastes, i.e., hazardous wastes that contained no material or energy value, and therefore, could not contribute to the production of the aggregate "product" Marine Shale claimed to produce. <u>See Id.</u> at 1381.

This principle applies equally to Encycle's operations. Obviously, metals cannot be recovered from hazardous wastes that contain virtually no metals. "If the waste does not in fact serve its alleged function in the process, then sham recycling is occurring." <u>Marine Shale</u>, 81 F. 3d. 1361 at 1365 (5th Cir. 1996). For use in its alleged "products", Encycle was purportedly only accepting wastes for metals recycling that could contribute in a significant way to the production of metal concentrates; that is, wastes that contained recoverable quantities of target metals. In its submittal to the TWC, Encycle represented that it was performing appropriate screening on wastes accepted by Encycle for incorporation into metals concentrates. <u>See</u> Letter from Cardenas to Reynolds of 7/12/89, at 2 a copy of which is attached as Exhibit E to the settlement statement (maintaining that Encycle had a procedure to determine whether a quality material can be reclaimed from the waste).

As shown in Exhibits A-1 and A-2, hereto, however, Encycle routinely accepted wastes with little or no metals values, and "blended" these wastes into its metals concentrates. The data in Exhibit A-1 is a summary of material movement tickets, also known as batch sheets ("MMTs") provided to the governments by Encycle. As confirmed by Encycle employees, the MMTs are management and process documents used routinely by Encycle. According to Encycle employees, as each load of incoming material is received it is assayed. The assay data is entered into a computer for use on the MMTs. At no time during any of the site visits by EPA investigators did anyone at Encycle state that the data on the MMTs do not fully and accurately reflect assays of the material in question.

After providing a number MMTs to the governments, and after a number of Encycle representatives provided statements to government investigators establishing the reliability of these records, Encycle and ASARCO contended in their settlement statement, <u>for the first time</u> that these Encycle records are somehow inaccurate. As a result, Texas investigators returned

-3-

this week to Encycle to review Encycle assay data. For the MMTs summarized on Exhibit A-1 we have confirmed that the assay data supports the data on the MMTs, where such data was available. Moreover, even in this preliminary review of Encycle assay data this week additional evidence of sham recycling was discovered. Exhibit A-2 is a summary of assay data for a number of specific generators showing waste loads which were accepted and processed at Encycle. This data shows that numerous loads of these specific waste streams had virtually no recoverable metals. From our preliminary review of Encycle material movement tickets and assay data, it can be determined that at least 247 shipments, totaling approximately 5,079 tons of hazardous waste that had virtually no metals value, were received and incorporated into Encycle alleged "products". This activity, plain and simple, was illegal treatment and disposal of hazardous waste, since the wastes could not have contributed in any significant way to the production of the metals concentrates.

In addition to accepting wastes with no significant value for mixture into its alleged "products", Encycle also mixed hazardous waste sludges generated from its wastewater treatment plant into its alleged "products". This is another form of sham recycling since these hazardous waste sludges had no recycling value. The sludges from the WWTP are hazardous wastes because they derive from hazardous wastes. 40 C.F.R. § 261.3(c)(2). Encycle has represented that its hydrometalurgical processes are designed to remove the metals from the wastes processed. Therefore, these sludges contained no significant metals value and must have been included for disposal purposes only. Since they had no legitimate recycling value they could have added no value to the alleged "products". Evidence obtained regarding the historic Encycle processes establish that all wastewaters generated from the hydrometalurgical processes flow to the pretreatment units in Facility 1. Wastewater is pretreated and residues which may arguably contain some metals values recovered. These residues are also mixed with the alleged "product". Pretreated wastewater is then discharged to the wastewater treatment plant, also known as the neutralization plant ("WWTP") for further treatment. Solids generated at the WWTP were put back in the processes while the effluent was discharged through NPDES outfall 001. See copies of Encycle's own process flow diagrams attached hereto as Exhibit B. Once these clearly sham wastes carrying listed waste codes were mixed with other potentially legitimate waste streams and into Encycle's alleged products, there was no question that the resultant mixtures were regulated RCRA hazardous waste.

-4-

        The illegal treatment and disposal activities resulting
from sham recycling could not possibly have been sanctioned by
the TWC letter since the letter references a recycling exemption
only available for legitimate recycling activities.  The Texas
regulation cited by the TWC in the 1989 letter, 31 TAC
§ 335.1(F)(ii), is based on federal regulation 40 C.F.R.
§ 261.2(e)(1)(ii).  In the publication of the definition of solid
waste on January 4, 1985, EPA articulated the criteria for
legitimate recycling. 50 Fed. Reg. 614 at 638-639 (January 4,
1985).  Also see, 50 Fed. Reg. at 646 n.36 (noting that "the
wastes must contribute to the effectiveness of the waste-derived
product" to be regarded as recycled).  These criteria were
reiterated on numerous occasions prior to Encycle's operations.
See, e.g., 53 Fed. Reg. 17,578, 17,606 (1988) (explaining that
recycling means that the hazardous waste legitimately contributes
to the product) Also see, Memorandum from Lowrance to Hazardous
Waste Management Division Directors EPA Regions I-X at 1-2 and
attachment (April 26, 1989), a copy of which is attached hereto
as Exhibit C (a major consideration in assessing whether an
activity is sham recycling is whether the material truly has
value).  Moreover, in its 1989 letter, the TWC reiterated to
Encycle that any exempt recycling must be legitimate: "[i]n order
to exempt any waste from regulation as solid waste, TWC must be
assured the method of managing and recycling the waste is
legitimate, beneficial, allowable under current state and federal
regulations, and assures the protection of the public health and
the environment." TWC Letter attached as Exhibit A to the
settlement statement at 5.  Therefore, Encycle and ASARCO have no
argument that the TWC letter somehow sanctioned sham recycling or
that they were not fairly notified of the requirement that any
recycling must be legitimate.

## III. Encycle Alleged "Products" Do Not Qualify For The Use/Reuse Exemption Claimed.

        The settlement statement accuses EPA of not clearly
articulating its basis for determining that Encycle alleged
"products" are not exempt from the definition of solid waste and
are regulated hazardous wastes.  Therefore, once again the
governments shall articulate this basis here.  There is no
dispute that Encycle alleged "products" contain listed hazardous
waste.  There is further no dispute that Encycle alleged
"products" are reclaimed at the smelters.  As such, the Encycle
alleged "products" are hazardous wastes until they are ultimately
reclaimed. 40 C.F.R. § 261.2(c)(3) and Table 1 therein.

        Encycle and ASARCO have claimed that Encycle alleged
"products" are exempt from the definition of solid waste because

they are "used or reused as effective substitutes for a commercial product." 40 C.F.R. § 261.2(e)(1)(ii) and 31 T.A.C. 335.1(F)(ii). When the definition of solid waste was promulgated in 1985, however, it was made clear in the Federal Register publication that reclamation and use/reuse are mutually exclusive terms and that an exemption for use/reuse as an ingredient or as an effective substitute for a commercial product cannot apply when reclamation, such as metals recovery, is occurring.

In its proposed definition of reclamation in 1983, EPA had considered an exception that would have covered use or reuse of materials "as effective substitutes for raw materials in processes using raw materials as principal feedstocks (for example, sludges used as substitutes for ore concentrates in primary smelting)" This exception, however, was expressly excluded from the final definition of reclamation promulgated in 1985. Compare Proposed Rule at 48 Fed. Reg. 14472 at 14508, § 261.2(c)(1)(i),(ii),(iii) with Final Rule at § 261.2(e)(1)(i),(ii),(iii) at 50 Fed Reg. at 664. Note that the definition of reclamation was proposed essentially as promulgated, but that three types of reclamation were to be considered use/reuse (and carved out of the reclamation definition), and that there was no independent definition of the term use/reuse in the proposed rule. In the final rule, of course, the terms reclamation and use/reuse became independent, and as shown below, mutually exclusive.

The 1985 preamble to the final rule unambiguously explained the fate of the proposed exclusion (See 50 Fed. Reg. 614 at 633-634, and 637-641 (January 4, 1985)), and the resultant RCRA Subtitle C regulatory status of the wastestreams that might have otherwise qualified for the proposed exclusion. EPA "decided not to promulgate this exclusion as proposed, but rather to limit its scope to the closed-loop production situations..." Id., at 640. The preamble also states, "[t]he final regulations thus provide that the following secondary materials are wastes when reclaimed by either primary or secondary reclamation operations, unless the materials are returned to the primary smelting process from which they were generated without first being reclaimed: (1) [s]ludges and by-products that are listed in §§261.31 and 261.32[;] (2) [a]ll hazardous spent materials..." Id. at 641 (emphasis added).

The preamble discussion of the final definition of solid waste provides unequivocally that the use/reuse exemptions are not applicable to materials that are reclaimed. In explaining the final definition of reclamation EPA states,

> Under the final rule, spent materials, listed sludges, and listed by-products that are processed to recover usable products, or that are regenerated - i.e., that are reclaimed - are solid wastes. If the material is to be put to use after it has been reclaimed, it still is a solid waste until reclamation has been completed. Thus, the fact that wastes may be used after being reclaimed does not affect their status as wastes before and while being reclaimed.

> 50 Fed. Reg. 614 at 633 (January 4, 1985)(Emphasis added)

In the discussion of the use/reuse exemptions the Agency made clear again that the exemptions do not apply to materials that are being reclaimed.  The preamble provides a list of circumstances where "the nature of the material or the nature of the recycling activity indicates that RCRA jurisdiction exists." EPA concludes the list by stating " when a component of the material is recovered as an end product, the material is being reclaimed, not used." 50 Fed. Reg. 614, 638 ( January 4, 1985)(emphasis added).

    The preamble also elaborates on the distinction between use as a substitute for a commercial product and reclamation:

> When secondary materials are *directly* used as substitutes for commercial products, we also believe these materials are functioning as raw materials and therefore are outside of RCRA's jurisdiction and, thus, are not wastes.  Examples are certain sludges that are used as water conditioners and by-products [sic] hydrochloric acid from chemical manufacture used in steel pickling.  In these examples, the recycled materials are substituting for other commercial products, and material values are not being recovered from them.

Id. at 619-620 (underline added).

In light of the final promulgation of the rule, use/reuse can occur only if a component of the material (material values) is not recovered as an end product, otherwise the wastes are being reclaimed.

    Any analysis under the use/reuse exclusions must therefore focus on whether reclamation of the wastes is occurring.  Reclamation is defined as either recovery of a useful product or regeneration of a product for its original use. 40 C.F.R. § 261.1(c)(4).  Recovery is defined as the recovery of distinct components of a secondary material as separate end

products.  40 C.F.R. § 261.1(c)(5)(I).  Therefore, metals recovery through smelting is obviously reclamation.

Encycle and ASARCO base their reliance on the use/reuse exemption on the fact that Section 261.2(e)(1)(ii) (the commercial product use/reuse exemption) does not contain an express proviso disallowing the exemption for wastes that are reclaimed.  Given the clear intent of the commercial product use/reuse exemption however, such a proviso was unnecessary.  As background for the final rule, the April 4, 1983 preamble explained the exclusion to cover materials used "as substitutes for commercial products in particular functions or applications. An example is spent pickle liquor used as a phosphorus precipitant and sludge conditioner in wastewater treatment.  This does not regenerate or recover the pickle liquors." 48 Fed. Reg., at 14488 (emphasis added).  The explanation in the 1985 preamble cited above also states unequivocally that a secondary material must be directly used as an "effective substitute for a commercial product" and not undergo any type of preprocessing to be subject to the exemption.  In light of this context, Encycle and ASARCO's semantic argument is unavailing.

Encycle does not produce a reclaimed "product" that would be free from RCRA regulation.  Spent materials, or listed sludges or by-products (such as F006) were the majority of Encycle's feedstocks.  See EPA's summary of waste received and processed at Encycle, a copy of which is attached as Exhibit D-1 hereto.  There is no question that Encycle alleged "products" must undergo reclamation at the smelters if any actual metals recycling is going to occur.  See EPA's summary of Encycle shipments to ASARCO smelters, a copy of which is attached as Exhibit D-2.  These types of wastes are hazardous wastes under RCRA because they are destined for metals reclamation and they remain hazardous wastes until reclamation is complete.  There is no question that Encycle's hydrometalurgical processes constitute, at best, only partial reclamation.  No actual metals recovery takes place at Encycle, this occurs only at the smelters.  EPA has clearly articulated that hazardous wastes that are only partially reclaimed or processed minimally, remain hazardous wastes until material recovery is complete. 40 C.F.R. § 261.2(c)(3).  See also, 48 Fed. Reg. at 14489, which shows that as early as 1983, EPA clearly articulated that preparation for reclamation was not complete reclamation: "[w]e also caution that waste materials do not become products if they are merely processed minimally - i.e., operations that leave materials unfit for use without further processing.  For instance, a hazardous sludge remains a waste when it is dewatered and sent to a metal reclaimer or used in a manner constituting disposal." and 50 Fed.

Reg., at 634, which states that "reclaimed metals that are suitable for direct use, or that only have to be refined to be usable are products, not wastes. . . . The principle . . . does not apply to wastes that have been processed minimally, or to materials that have been partially reclaimed but must be reclaimed further before recovery is completed." (Emphasis added).

    EPA interpretive memoranda available to the public during the relevant period reiterated this concept.  For example, in 1989, the Director of the EPA Office of Solid Waste circulated a memorandum to each of her Regional Hazardous Waste Management Directors regarding F006 recycling which addressed these issues. The memorandum states: "For F006 used as a feedstock in a metals recovery smelter, the Agency views this as a recovery process rather than use as an ingredient in an industrial process and therefore, considers this to be a form of treatment that is not currently regulated [citations omitted].  Furthermore, because this is a recovery process, the F006 waste remains a hazardous waste (and must be managed as such prior to the introduction to the process)..." Memorandum from Lowrance to Hazardous Waste Management Division Directors EPA Regions I-X at 2-3 (April 29, 1989)(emphasis added).  Exhibit C hereto.  Also, in 1989, the Deputy Director of the Characterization and Assessment Division of EPA's Office of Solid Waste in discussing the exclusion in 40 C.F.R. § 261.2(e)(1)(ii)(use/reuse of a material as a substitute for a commercial product), stated, "This exclusion applies to materials which are used or reused without reclamation (see the January 4, 1985 Federal Register notice, 50 FR 637, 638)." EPA Memorandum from Straus to Ulrich at 2 (Sept. 12, 1989) a copy of which is attached as Exhibit E.  Such memoranda have been publically available since the RCRA Policy Compendium was started in 1985.

    Appropriately, the TWC cited to the pertinent Federal Register language in its first letter to Encycle of December 30, 1988: "If the material is to be put to use after it has been reclaimed, it is still a solid waste until reclamation has been completed.  Thus, the fact that wastes may be used after being reclaimed does not affect their status as wastes before and while being reclaimed."  The TWC letter further provided that according to the federal register notice, listed wastes that have been partially reclaimed, but must be reclaimed further, are not exempt from the definition of solid waste.  See letter to Stephenson from Hatten at 1-2 (December 30, 1988).  A copy of which is attached as Exhibit F.  Again, these provisions from the Federal Register are equally applicable to both the ingredient and commercial product use/reuse exemption.

-9-

Therefore, in the 1985 to 1989 timeframe, Encycle and ASARCO were on <u>actual</u> notice from the regulations (including the definition of solid waste promulgated in 1985), the Federal Register preambles cited herein, and EPA interpretive correspondence in that period, and further, were expressly notified by the TWC letter of December 30, 1988, of EPA's regulatory interpretation. They were clearly on notice that under EPA's view, Encycle alleged "products" were not eligible for any use/reuse exemption. The analogous Texas regulations were based on the Federal regulations, therefore, Encycle and ASARCO were also on notice of EPA's stated position that Encycle alleged "products" could not qualify for the analogous Texas exemption.

Encycle's legal analysis provided to the TWC in its letter of July 12, 1989 was wrong because it omitted consideration of the pronouncements of EPA on these issues and did not consider the intent and meaning of the regulations incorporated into the Texas program, in light of these pronouncements. Encycle's analysis failed to consider that Encycle alleged "products", containing spent materials and listed by-products and sludges, were ultimately reclaimed at the smelters. As such, Encycle alleged "products" could not qualify for a use/reuse exemption. Even assuming that Encycle only accepted legitimate recyclables, the legal interpretation in the TWC letter, upon which Encycle and ASARCO rely, is erroneous. As provided above, the RCRA regulations distinguish between reclamation and use/reuse and make these mutually exclusive categories. This was overlooked in Encycle's analysis.

IV. **Encycle and ASARCO Cannot Rely on the September 27, 1989 TWC Letter Because The Description of Encycle's Processes Was Inaccurate.**

Encycle and ASARCO cannot rely on the TWC letter for the additional reason that Encycle failed to accurately document its processes to the TWC. In its submittal to the TWC on July 12, 1989, Encycle only documented hydrometalurgical processes and assured the TWC that all wastes would be processed through the hydrometalurgical processes:

E/TI produces metallic compounds from these wastes through a series of reclamation steps as shown in the general flow diagram (Attachment B). The waste streams are first subjected to pH adjustment and filtration (for corrosive wastes); alkaline chlorination for cyanide wastes; and a reduction step for chromium bearing wastes. Following these steps, the treated

stream goes through further pH adjustment and/or
sulfide precipitation and filtration steps.

Letter from Cardenas to Beinke at 1 (July 12, 1989).  A copy of
which is attached as Exhibit E to the settlement statement.

Encycle further represented that "the process is an extensive one
involving careful pH control and sequential precipitation." Id.
at 2.  There is no dispute that substantial amounts of hazardous
wastes received by Encycle were put directly into "product" bins
without any processing whatsoever at Encycle.  See EPA summary of
wastes received and processed by Encycle, a copy of which is
attached as Exhibit D, and EPA process flow diagram which shows
mixing and blending ("PMP") operations, a copy of which is
attached = Exhibit G.  Since the TWC letter was based on the
representations that an extensive hydrometalurgical process was
to be performed on all the wastes received by Encycle, it cannot
be relied on to cover wastes that were not processed in this
manner, or to otherwise "properly" processed wastes that were
mixed with unprocessed wastes (in combination, approximately 81%
of the feedstocks comprising Encycle alleged "products" during
the period in question).  See Exhibit D.  In addition, the
mixture of sham wastes into the process streams, or directly into
alleged "product" divests the resultant mixtures of any exclusion
the non-sham portion might have enjoyed.

     Encycle and ASARCO contend that the TWC letter
addressed the mixing and blending activities by providing, "the
fact that a portion of the described process is performed at
another location does not alter the status of Encycle/Texas
Inc's. solids..."  Exhibit A to the settlement statement at 4
(emphasis added).  This language, however, cannot possibly be
construed to cover the approximately one third of hazardous
wastes received by Encycle that did not undergo any portion of
the process documented to the TWC and which were mixed directly
into "product" bins.  In addition, the mixing activity, which
provides no significant concentrating of metals in the waste
being blended in, constitutes unpermitted treatment because it
does not meet the definition of reclamation (it is not "recovery
of distinct components of a secondary material as separate end
products").  See 40 C.F.R. 261.1(c)(5)(i).

     Encycle and ASARCO attempt to argue that Texas knew
fully at the outset about the direct mixing of hazardous waste
unprocessed at Encycle into its alleged "product" because of
annual inspections under the storage permit, and other
interactions with Encycle representatives.  No evidence of this
is provided in the settlement statement, however.  Encycle and

ASARCO merely present a copy of an informal internal Encycle document and the self-serving, unsubstantiated speculation of a former Encycle President that this document "may" have been provided to Texas.  Other weak attempts at proof on this point are references to inspection reports starting in 1994 that cite issues regarding the direct mixing operations.  By then, of course the investigation that culminated in this enforcement action was commencing.  As such, these references do not show acquiescence on the part of the state in the unlawful blending activities.  Texas' position regarding these matters was confirmed in prior meetings with Encycle and further confirmed recently in the June 9, 1998 letter to the President of Encycle from the Hazardous Waste Director of the Texas Natural Resources Conservation Commmission which states, inter alia, that "the available information indicates that the exemption provisions cited in the earlier letters are not applicable to the materials Encycle produces and Encycle's reliance on the letters has been misplaced." See letter from Hibbs to Mossholder (June 10, 1998), a copy of which is attached as Exhibit H hereto.

Encycle did not process hazardous wastes received as represented.  It is therefore, not surprising that inspections by TNRCC and site visits by prospective customers did not initially disclose the RCRA violations associated with Encycle's operations.  Encycle failed to properly screen wastes entering its process as outlined in Section II above (sham recycling) and did not process all wastes hydrometalurgically.  This was inconsistent with its representations to the TWC.  Additionally, Encycle did not specify to the TWC in it submittals that it was putting waste sludges with no recycling value back into its process from its wastewater treatment plant.  For these reasons, Encycle and ASARCO cannot rely on the TWC letter.

## V.    Encycle and ASARCO Were On Notice of EPA's Regulatory Interpretation.

Agency promulgation of a regulation provides fair and adequate notice of the Agency's interpretation "[i]f, by reviewing the regulations and other public statements issued by the agency, a regulated party acting in good faith would be able to identify, with 'ascertainable certainty,' the standards with which the agency expects parties to conform." General Electric Co. v. United States EPA, 53 F.3d 1324, 1329 (D.C. Cir. 1995).  The definition of solid waste, as promulgated by EPA in 1985, is 'reasonably comprehensible to people of good faith.' Id. at 1330 (citing McElroy Electronics Corp. v. FCC, 990 F.2d 1351, 1358 (D.C. Cir. 1993)).  The preamble to the regulations in the

Federal Register states unequivocally that use/reuse and reclamation are mutually exclusive; that the proposed exclusion Encycle and Asarco might have been able to enjoy was expressly not promulgated, and that Encycle and Asarco's activities, when taken together, clearly constitute reclamation activities.  See supra discussion at Part III.  The preamble to a regulation should be considered in construing the regulation and determining the meaning of the regulation.  Wiggins Bros., Inc. v. Department of Energy, 667 F.2d 77 at 78 (Temp Emer. Ct. App. 1981), cert. den., 456 U.S. 905 (1982).  Also see, Kennecott Utah Cooper Corp. v. Department of Interior, 88 F.3d 1191, 1223 (D.C. Cir. 1996)(Court may infer that the agency intended the preamble to be binding if what it requires is sufficiently clear).  The preamble is clear in stating that no use/reuse exemption is available if the material is reclaimed  and in defining sham recycling.  Taking into account the preamble language the only reasonable interpretation is that the use/reuse exemption cannot apply when reclamation type activities are  occurring.

    As stated above, Encycle and ASARCO had fair notice from the regulations.  However, even if Encycle and ASARCO successfully argue that they did not receive fair notice from the promulgation of the regulations in 1985, Encycle and ASARCO did receive fair notice of EPA's interpretation from the TWC in 1988.  The TWC letter of December 30, 1988, Exhibit F hereto, affirmatively stated that according to EPA's interpretation of the regulations Encycle alleged "products" were not exempt.  Therefore, even if the language of the regulations and federal register notices were found to be ambiguous, Encycle and ASARCO had actual notice of EPA's interpretation the day it received the TWC's letter.

    Similarly, Encycle and ASARCO have had fair notice from the regulations and other public statements by EPA regarding the distinction between sham recycling and legitimate recycling.  See supra discussion at Part II.  Moreover, the TWC letter of September 27, 1989, Exhibit A to the settlement statement, affirmatively stated that any claimed "recycling" must be legitimate.

## VI.   Encycle and Asarco's Proposal Does Not Appropriately Reflect The Gravity and Duration Of The Violations, And The Economic Benefit Resulting From The Violations

    In light of the foregoing, it is clear that the central basis for ASARCO's proposal in the settlement statement of June 9, 1998 is flawed and the proposal should be reconsidered in its entirety.  Nontheless, we will address a few points regarding the

Encycle and ASARCO penalty calculations and SEP proposals here to
set the stage for further discussions.

## A. Penalties For Encycle

With regard to the Waste Analysis Plan violations
Encycle and ASARCO must consider the failure of Encycle's waste
screening procedures in the evaluation of these claims. As a
result, Encycle engaged in substantial sham recycling.

With regard to the other violations related to Encycle's
alleged recycling activities, Encycle and ASARCO's analysis must
be reevaluated in light of Sections I through V above.

## B. Penalties For The ASARCO Smelters

With regard to the El Paso facility, Encycle and ASARCO
contend that because Texas did not identify the Encycle alleged
"product" as hazardous waste during inspections at El Paso, the
governments should not seek a substantial penalty at El Paso. The
Encycle wastes were handled at El Paso in the same way ore
concentrates were handled, however. As such, the Encycle wastes
were not easily identified at El Paso as hazardous wastes by
inspectors who did not have the information that ASARCO had
regarding the composition of the wastes. Likewise, at East
Helena, although it was difficult for inspectors to identify the
Encycle alleged "product" as hazardous wastes, once identified by
EPA and State of Montana officials, the mismanagement of Encycle
wastes at East Helena was included in the investigation of
Encycle. Further action on the part of Montana was unnecessary.
Since the key to confirming the regulatory status of Encycle
wastes at the smelters was the investigation of Encycle's
facility, it was appropriate for inspectors at the smelters to
reserve citing ASARCO for violations associated with Encycle
wastes until the full investigation was completed. The delay in
enforcement action was not acquiescence, it was the period of time
required for the full investigation to be completed.

With regard to economic benefit for each of the
smelters, the economic benefit ("BEN") scenarios used by EPA
(costs saved by not upgrading the smelters to lawfully manage the
hazardous wastes received) is the scenario based on actual events,
i.e., ASARCO actually managed hazardous wastes at the smelters.
Encycle and ASARCO's BEN scenario, that the wastes would not have
been received by ASARCO's smelters had they been identified as
hazardous wastes relies on speculation. While it is true that the
precise BEN enjoyed by ASARCO as a result of the subject

-14-

violations has yet to be determined, it appears that ASARCO benefitted substantially from the Encycle operation.

### C. World Resources Company

ASARCO and Encycle have asked that the prior resolution of RCRA enforcement matters involving World Resources Company ("WRC") influence the governments in their position in this matter. While WRC's operations have some similarities to Encycle's operation, the WRC matters referred to in the settlement statement were substantially different than this one. Encycle and ASARCO cite to an administrative penalty assessed against WRC in 1991 as grounds for assessment of a minor penalty for the violations of Encycle and ASARCO here. That WRC administrative order predated the current RCRA penalty policy, and is therefore, not comparable, however. With regard to the administrative order with WRC in Arizona, the facts of that situation were substantially different than the facts presented here. In that matter, WRC was handling its "product" as hazardous waste. While WRC briefly suspended its manifesting, claiming they were informally authorized to due so by Arizona, once advised that manifesting was indeed required, WRC promptly returned to its prior hazardous waste handling procedures.

### D. EPA And TNRCC Reactions To Supplemental Environmental Project ("SEP") Proposals

1. **Electrowinning**: Certain aspects of this proposed project potentially have merit as a SEP project under the Texas Natural Resource Conservation commission ("TNRCC") and the EPA SEP policies. The credit that Encycle can receive for the project, however, is limited. First, although both agencies wish to encourage efforts to develop and use experimental technologies, neither the TNRCC nor the EPA can subsidize the expansion or development of new business. This concern reduces the value of the proposed SEP significantly.

Second, while EPA is willing to give SEP credit for bench testing and pilot testing of new technology if there is some evidence that the technology will be successful, the TNRCC, believes that the environmental benefit of the assessment and testing of unproven technology is too intangible to qualify as a valid SEP project. Encycle's current proposal appears to be a purely experimental project which may or may not benefit the environment. It would be difficult to approve a SEP project without some measurable benefit to the environment.

The TNRCC and EPA would both like to encourage a
modification to the proposal that would give the proposal more
value as a SEP.  For example, once the technology was installed
and proven successful, the Agencies would entertain the
possibility of giving some SEP credit if Encycle processed
hazardous waste for small businesses not presently served by
Encycle, free of charge.  The Agencies might also consider SEP
credit if Encycle promoted the technology or provided training on
the technology to other recycling facilities.

        2.  **Demolition Projects**: Both the INRCC and EPA believe
that the value of these proposed projects is compromised by the
fact that Encycle will benefit substantially from the demolition
of the structures.  The Agencies believe that Encycle probably
would have performed the demolition for a number of reasons,
including the elimination of facilities that are no longer in use,
expansion of the facilities, and reduction of long term liability
for the companies.  To allow even minimal SEP credit for the
demolition projects, Encycle would need to prove that the
buildings are in fact contaminated and that there is a real
possibility that the contamination will be released into the
environment.  In evaluating SEP projects, the TNRCC and EPA weigh
heavily whether the project will improve the environment of the
community where the violation occurred.  As such, in addition to
establishing proof of contamination, Encycle needs to provide
evidence that the contamination has, or will, impact the community
surrounding the facility.  Many of the proposed demolition sites
appear to be located in the center of the facilities, which
reduces the likelihood of migration of contaminants off site.
Thus, the projects provide little protection for, or environmental
benefit to, the community.

        3.  **Mercury removal at East Helena**: At first blush, this
proposal appears to have potential merit as a SEP.  To make a
final determination, however, EPA would need to have more
information about the efficacy of the technology that would be
installed.  In addition, the Agency would need to be assured that
the mercury removal was not required as part of the on-going
clean-up activities at the site or under Clean Air Act
requirements.

        4.  **Note For El Paso**:  In the recent past, El Paso has
been the subject of an enforcement action by the TNRCC which
resulted in a SEP.  When evaluating a respondents
eligibility for a SEP, Texas' policy requires consideration of the
facility's compliance history.  During the settlement of the prior
action, the TNRCC agreed to an on-site demolition project as a
SEP.  ASARCO is still performing this SEP.  The fact that El Paso

is currently participating in the SEP program influences its
ability to participate in the TNRCC SEP program again.  While
Texas has not decided at this time to exclude El Paso from
consideration for the SEP program in this case, TNRCC is
particularly concerned about any additional projects that credit
ASARCO for improving its own facility.  Considering the facility's
compliance history, its involvement in the current RCRA
enforcement action, and the TNRCC's concerns about protecting the
integrity of the SEP program, the TNRCC will subject ASARCO's SEP
proposals at El Paso to careful scrutiny.  The TNRCC's primary
focus in evaluating any SEP proposals by ASARCO for El Paso will
be on securing a stronger, more direct benefit to the community.
EPA would be particularly interested in an air quality SEP at El
Paso.

     **5.  Guidance on developing SEP's for this case:**  The
focus of both the EPA and the TNRCC SEP policies is on encouraging
projects that benefit the community where the violations occurred.
While the proposed SEPs may have some beneficial environmental
impacts, they do not benefit the surrounding community.  This is
particulary important in light of the concerns raised about
contamination in neighborhoods near the facilities caused by
facility activities.  Both agencies would like to see, in
Encycle's and ASARCO's SEP proposals, a stronger focus on
benefitting the environment around the facilities.

### E. TNRCC Response To Encycle and ASARCO Comments on State Penalty Calculations

     Encycle and ASARCO's response to the TNRCC penalty
component of the governments' Summary of Violations is self
serving and misleading.  Encycle and ASARCO imply that
Encycle was ready to settle with the TNRCC for the demanded amount
of $275,000.  In fact, when the TNRCC determined to refer
Encycle's violations to the Texas Attorney General, Encycle's
settlement offer was considerably less than TNRCC's administrative
penalty demand.  In a letter from Keith Hobson to Ann Foster,
dated November 21, 1995, ETI made a "low ball" offer of $22,500 to
settle its penalty liability with the TNRCC.  Encycle never moved
off this figure, and arguably dropped its offer, when, on October
31, 1997 Mr. Hopson submitted a redlined version of TNRCC's
administrative order which contained no penalty offer at all.  As
late as February 4, 1998, in a meeting with TNRCC, Encycle
continued to dispute the amount of TNRCC's penalty demand, but
made no new counter offer.  Contrary to the implication of the
settlement statement, the parties had resolved only one technical
item - Encycle's proposed remediation approach to the lagoons - at
the time TNRCC determined to refer the matter to the Attorney
General's Office.  Many questions remained regarding the other

items addressed in the Executive Directors's Preliminary Report.

        Like any litigant, TNRCC can take a non-suit in any action
it prosecutes administratively or through the Attorney General.
Indeed, given the great gap between the TNRCC and Encycle on
penalties and the relative lack of progress in resolving the
technical issues at the Encycle facility, TNRCC was justified in
exercising its discretion and referring the matter to the Attorney
General for prosecution in connection with the pending federal
action.  The penalty demanded by the State of Texas reflects the
fact that the Attorney General is authorized to seek a larger
penalty than the TNRCC (up to $25,000 per day versus $10,000).
Compare Tex, Health & Safety Code Ann. 7.102) with 361.251 (now
Water Code 7.052).  The penalty demanded by the State of Texas
reflects this fact.  TNRCC's penalty demand also reflects a modest
additional penalty for a violation not previously considered by
the TNRCC.

## VII.  EPA and TNRCC Corrective Action Requirements

### A. Encycle Facility, Corpus Christi

        Any settlement must include commitments by Encycle and
ASARCO to complete ongoing corrective action at the Encycle
facility and to perform additional corrective action as discussed.
Here is additional information regarding the governments current
position on corrective action requirements at the Encycle
facility.

        1. **Oversight:**  Oversight of the corrective action at the
facility will be conducted under TNRCC supervision with EPA
concurrence.

        2. **Risk Assessment:** Encycle and ASARCO may determine
human health risk and all media cleanup levels at the Facility
based on the most current version of the Texas Risk Reduction
Rules under the following conditions:

                a.    If clean-up levels are based on TNRCC's Risk
                      Reduction Standard 1, EPA must concur on the
                      background values used as the cleanup levels.

                b.    If clean-up levels are based on TNRCC's Risk
                      Reduction 2, Encycle and ASARCO shall insure
                      that levels are fully protective of human and
                      ecological receptors.  Where appropriate,
                      TNRCC reference values shall be adjusted in

accordance with provisions of the TNRCC Risk
Reduction rules.

Throughout the risk assessment process, EPA will have its normal
federal oversight responsibilities.

For assessment of ecological risk, Encycle and ASARCO
shall use TNRCC's draft guidance for ecological risk assessment,
provided that EPA concurs in the methodology and values used.  For
surface water, Encycle and ASARCO shall use Texas Ambient Water
Quality Standards.

In recognition of the fact that TNRCC is currently in
the process of revising its Risk Reduction Rules, Encycle and
ASARCO shall use the approved version in place when the Work Plan
is approved.

3. **Corrective Action Approach**: ASARCO and Encycle shall
use a sitewide approach to corrective action as opposed to a unit-
by-unit approach.  A sitewide approach would involve corrective
action on releases of hazardous constituents to all media (soil,
air, groundwater, surface water and sediment) including all units
and on-site/off-site areas which may have been impacted by those
releases.  The sitewide RFI shall, at a minimum, include
investigation of media in, under, and nearby the units listed
below.

- 01 Landfill

- East and West Lagoons

- Railroad Track Area

- Feed Tanks 1 and 2

- Road leading to and west of Building C

- Grain Elevator

- Former Sludge Drying Beds

- Reactor Clarifier

- Facilities 1, 2, 3 and 4

- West Cell House

- NOR 43

- Product Storage Building (Building "C")

- Product Storage Bins

- Building north of Facility 2

- Old Casting Building

- Outfall Number 002 off East Lagoon

- The Corpus Christi Ship channel in vicinity of the outfalls

- Any on-site or off-site waste disposal areas.

Encycle and ASARCO shall include investigative results of its current RFI being completed under its permit issued by TNRCC in its sitewide RFI.

4. **Corrective Measures:** Certain corrective measures at operating units at the facility may be deferred until final facility closure, if the RFI is completed immediately. However, the governments must retain the authority to determine which measures may be deferred depending on the results of the RFI and the risk assessment.

### B. ASARCO Smelter, El Paso

Any settlement must include commitments by ASARCO to complete ongoing corrective action at the ASARCO smelter in El Paso and to perform some limited additional corrective action. ASARCO's cooperation regarding the July 1, 1998 site visit was greatly appreciated. The governments' requirements for additional corrective action at El Paso will be provided shortly.

### VIII. Encycle Future Operating Conditions

Recycling is an important goal of RCRA and one of the objectives of the governments in this matter is to facilitate lawful recycling. As part of an appropriate overall settlement, the governments are willing to sanction continued operations at Encycle under a consent decree with appropriate conditions, until a permit application is acted upon. We believe Encycle has made substantial progress on redesigning its operations to conform to applicable law. Once the next version of the operating plan and waste analysis plan are received, more detailed discussions can occur regarding required operating conditions.

### IX.   Financial Considerations

Encycle and ASARCO have requested that the governments consider the financial conditions of Encycle and ASARCO as part of our settlement analysis.  We have submitted a detailed request on July 23, 1998, to review financial information.  This information should be provided as soon as possible.  If Encycle can demonstrate a bonafide inability to pay, we can consider recommending that some portion of the penalty be paid with in-kind services utilizing Encycle's recycling capabilities.